**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CAYUGA NATION, a federally recognized Indian Nation, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Civil Action No. <u>5:24-cv-537 (BKS/TWD)</u> |
| NEW YORK STATE GAMING COMMISSION; | ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| BRIAN O'DWYER, in his official capacity as the Chair and Commissioner of the New York State Gaming Commission; | ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| JACKPOCKET INC., | ) ) | |
| *Defendants*. | ) ) ) | |

Plaintiff Cayuga Nation (the "Nation"), as and for its Complaint against the above-named Defendants, hereby alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is an action to enjoin the New York State Gaming Commission and the Chair of the Commission in his official capacity from continuing violations of federal law to protect the Nation's 64,015-acre federally-recognized reservation in the Finger Lakes Region of New York (the "Reservation"), and to bring into compliance with federal law the New York State lottery vending machines and a certain mobile lottery app that was allowed to operate within the Nation's Reservation.

2.      The official-capacity Defendant, Brian O'Dwyer, is named pursuant to *Ex parte Young*, 209 U.S. 123, 123 (1908) and its progeny, which allow declaratory and injunctive relief against state officials in their official capacities to stop ongoing violations of federal law,

notwithstanding the immunity afforded to States under the Eleventh Amendment of the United States Constitution, as a State does not have, and therefore cannot confer on its individual officers, any authority to violate federal law.

3.    Federal law preempts New York State's attempts to game on the Nation's Reservation.  Gaming on Indian lands is within the jurisdiction of the Indian tribes, and regulated by the provisions of the Indian Gaming Regulatory Act (the "IGRA").  25 U.S.C. § 2701, et seq.

4.    Despite clear statutory mandates, Defendants, excluding Jackpocket Inc. ("Jackpocket"), installed New York State lottery vending machines within the Nation's Reservation and issued a Lottery Courier Service License to Defendant Jackpocket allowing Jackpocket to operate on mobile devices throughout New York State and within the Nation's Reservation.

5.    The Nation therefore brings this action seeking declaratory and injunctive relief.

    a.  First, the Nation seeks a declaration that Defendants, excluding Jackpocket, violated federal law by operating New York State lottery vending machines within the Nation's Reservation.

    b.  Second, the Nation seeks a declaration that Defendants, excluding Jackpocket, be enjoined from operating any New York State lottery vending machines within the Reservation.

    c.  Third, the Nation seeks a declaration that Defendants, excluding Jackpocket, violated federal law by issuing the Lottery Courier Service License to Jackpocket without excluding the Nation's Reservation.

    d.  Fourth, the Nation seeks a declaration that a  portion of the Lottery Courier Service License to Jackpocket (License Number COURIER-001.01) which allows

Jackpocket to operate within the Nation's Reservation invalid.

e.  Fifth, that Jackpocket Inc. be enjoined from operating within the Nation's Reservation.

6.  Such relief will bring the New York State lottery vending machines, as well as a certain mobile lottery app that is allowed to operate within the Nation's Reservation, into compliance with federal law.

## PARTIES

7.  Plaintiff Cayuga Nation is a federally recognized Indian nation. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 54,654, 54,655 (Aug. 11, 2023).  The Nation is governed by the Cayuga Nation Council.

8.  Defendant New York State Gaming Commission ("NYSGC") is a state agency that regulates gaming activities in New York State, with a principal place of business at One Broadway Center, Schenectady, New York 12301-7500.

9.  Defendant Brian O'Dwyer is a Commissioner of NYSGC and the Chairman of the NYSGC Commissioners. He is sued here only in his official capacity.

10.  Defendant Jackpocket Inc. is a Delaware corporation registered to do business in New York. They have a principal place of business at 1967 Wehrle Drive, Suite 1-086, Buffalo, New York 14221.

## JURISDICTION AND VENUE

11.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims at issue arise under federal law; 28 U.S.C. § 1362 because this action is brought by an Indian nation and arises under federal law; and 28 U.S.C. §§ 2201–because the Nation is moving under the Declaratory Judgment Act.

3

12.     This Court has federal question jurisdiction because the Complaint alleges ongoing violations of the Nation's Reservation rights pursuant to federal law, including 25 U.S.C. § 2701, et seq.

13.     This Court has jurisdiction to grant prospective injunctive and declaratory relief under the Court's inherent equitable powers, and under *Ex parte Young*, 209 U.S. 123 (1908) against the named New York State official, Brian O'Dwyer.

14.     This Court has personal jurisdiction over Defendant NYSGC and Commissioner Brian O'Dwyer because NYSGC maintains offices in this District, does business in New York and in this District, and because many of the acts complained of and giving rise to the claims alleged herein occurred in this District.

15.     This Court has personal jurisdiction over Defendant Jackpocket because it does business in New York, in this District, and many of the acts complained of and giving rise to the claims alleged herein occurred in this District pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND AND ALLEGATIONS

### A.  Statutory Authority Regarding Gaming on Indian Lands

16.     "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."  25 U.S.C. § 2701(5).

17.     Class III Gaming is defined as "all forms of gaming that are not class I gaming or class II gaming."  25 U.S.C. § 2703(8).  Specifically, Class III Gaming includes:

(a)     Any house banking game, including but not limited to—

(1) Card games such as baccarat, chemin de fer, blackjack (21), and pai gow (if played as house banking games);

4

Case 5:24-cv-00537-BKS-TWD   Document 1   Filed 04/18/24   Page 5 of 16


          (2) Casino games such as roulette, scraps, and keno;

(b)      Any slot machines as defined in 15 U.S.C. 1171(a)(1) and electronic or electromechanical facsimiles of any game of chance;

(c)      Any sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai; or

(d)      Lotteries.

25 C.F.R. § 502.4.

18.      Class III Gaming is lawful on Indian lands only if such activities are authorized by an ordinance or resolution that is adopted by the governing body of the Indian tribe having jurisdiction over such lands, meets the requirements of 25 U.S.C. § 2710(b), and is approved by the Chairman of the National Indian Gaming Commission ("NIGC"). 25 U.S.C. § 2710(d)(1)(A).

19.      Pursuant to 25 U.S.C. § 2710(b), the Chairman shall approve any trial ordinance or resolution if such ordinance or resolution meets the following requirements:

(A) "except as provided in paragraph (4), the Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity;

(B) net revenues from any tribal gaming are not to be used for purposes other than—

     (i)  to fund tribal government operations or programs;

     (ii) to provide for the general welfare of the Indian tribe and its members;

     (iii) to promote tribal economic development;

     (iv) to donate to charitable organizations; or

     (v) to help fund operations of local government agencies;

(C) annual outside audits of the gaming, which may be encompassed within existing independent tribal audit systems, will be provided by the Indian tribe to the Commission;

27633436.4

(D) all contracts for supplies, services, or concessions for a contract amount in excess of $25,000 annually (except contracts for professional legal or accounting services) relating to such gaming shall be subject to such independent audits;

(E) the construction and maintenance of the gaming facility, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety; and

(F) there is an adequate system which—

(i) ensures that background investigations are conducted on the primary management officials and key employees of the gaming enterprise and that oversight of such officials and their management is conducted on an ongoing basis; and

(ii) includes—

(I) tribal licenses for primary management officials and key employees of the gaming enterprise with prompt notification to the Commission of the issuance of such licenses;

(II) a standard whereby any person whose prior activities, criminal record, if any, or reputation, habits and associations pose a threat to the public interest or to the effective regulation of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming shall not be eligible for employment; and

(III) notification by the Indian tribe to the Commission of the results of such background check before the issuance of any of such licenses."

25 U.S.C. 2710(b)(2).

20.     The tribal ordinance or resolution may also provide for the licensing or regulation of Class III gaming activities owned by any person or entity other than the Indian tribe. 25 U.S.C. § 2710(b)(4). This is provided, however, that the tribal licensing requirements must include the following requirements: (1) such gaming operation is licensed and regulated by an Indian tribe

27633436.4

pursuant to an ordinance reviewed and approved by NIGC in accordance with 25 U.S.C. § 2712; (2) income to the Indian tribe from such gaming are not to be used for purposes other than to fund tribal government operations or programs, to provide for the general welfare of the Indian tribe and its members, to promote tribal economic development, to donate to charitable organizations, or to help fund operations of local government agencies; (3) not less than 60 percent of the net revenues is income to the Indian tribe; and (4) the owner of such gaming operation pays an appropriate assessment to the NIGC under 25 U.S.C. 2717(a)(1) for regulation of such gaming.

21.    Further, any Class III gaming activities authorized by an ordinance must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State.  25 U.S.C. § 2710(d)(1)(C).  Any such Tribal-State compact must meet the requirements under 25 U.S.C. § 2710(d)(3)(C) and be approved by the Secretary of Interior and published in the Federal Register.  25 U.S.C. 2710(d)(3).

22.    "Indian lands" include "all lands within the limits of any Indian reservation."  25 U.S.C. § 2703(4)(A).

**B.  The Nation's Reservation**

23.    In 1794, the United States entered the Treaty of Canandaigua with the Cayuga Nation, and certain other Indian nations in New York, to resolve significant disputes that existed between the United States and those Indian nations. Treaty of Canandaigua, Preamble, 7 Stat. at 44.

24.    In the Treaty of Canandaigua, the United States recognized a federal reservation for the Cayuga Nation comprising 64,015 acres—located within what today are Seneca County, New York (which is located within the federal Western District of New York) and Cayuga County, New York (located within the federal Northern District of New York)—and pledged that the

7

"reservation[] shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." Treaty of Canandaigua, art. II, 7 Stat. at 45.

25.     In the years following the Treaty of Canandaigua, New York State claimed to enter into two treaties directly with the Cayuga Nation. In 1795, by the Treaty of Cayuga Ferry, the State claimed to acquire the Cayuga Nation's entire Reservation, with the exception of a three square-mile area on the eastern shore of Cayuga Lake, in exchange for a promise to pay the Nation $1,800 annually in perpetuity. In the 1807 Treaty with the Cayugas, the State claimed to purchase the Cayuga Nation's remaining three square-mile parcel for $4,800.

26.     However, because these two treaties with the State of New York "indisputably violated the Non-Intercourse Act, and were never subsequently approved through the federal treaty-ratification procedures," as a matter of law they are void and never "had any effect on the legal status of the Cayuga reservation," which remains fully intact. *Cayuga Indian Nation of N.Y. v. Seneca Cnty.,* 260 F. Supp. 3d 290, 309–10 (W.D.N.Y. 2017) (collecting cases).

27.     To this day, Congress has not disestablished the Nation's Reservation, nor authorized the sale of the Nation's reservation lands, *see generally id.* at 307-15 (collecting authorities), and "every federal court that has examined whether the Cayuga reservation was disestablished or diminished by Congress has answered that question in the negative." *Cayuga Indian Nation of N.Y. v. Gould,* 14 N.Y.3d 614, 639 (2010) (collecting cases).

28.     The Nation's 64,015-acre Reservation established by the Treaty of Canandaigua remains fully intact today.

**C. New York State Has No Authority to Conduct Class III Gaming on The Nation's Reservation**

29.     As discussed above, Class III Gaming are lawful on Indian lands only if such activities are authorized by an ordinance or resolution that is adopted by the governing body of the

8

Indian tribe having jurisdiction over such lands, meets the requirements of 25 U.S.C. § 2710(b), and is approved by the Chairman NICG.  25 U.S.C. § 2710(d)(1).

30.     The Nation has not adopted any ordinance pertaining to Class III Gaming on its Reservation.

31.     Therefore, no Class III gaming can be lawfully conducted on the Nation's Reservation.

32.     As discussed above, individually owned Class III Gaming on Indian lands is only permitted if the governing body of the Indian tribe adopted an ordinance that provides for the licensing of Class III gaming activities.  Further, any such licensing requirements must provide that at least 60 percent of the net revenues is income to the Indian tribe.  *See* 25 U.S.C. § 2710(b)(4).

33.     The Nation has not adopted any ordinance that provides for the licensing of Class III gaming on its Reservation by any person other than the Nation.  Rather, the Nation only has an Class II gaming ordinance, a copy of which is annexed as **Exhibit A**.

34.     The Nation did not license New York State to conduct Class III gaming activities on its Reservation.

35.     The IGRA preempts any state regulation or control of Indian gaming.  *See McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 170-71 (1973) (holding that state laws are not applicable to tribal Indians on an Indian reservation except where Congress has expressly intended that state laws shall apply); *Coeur d'Alene Tribe v. State*, 842 F. Supp. 1268, (D. Idaho 1994), *aff'd sub nom.* 51 F.3d 876 (9th Cir. 1995); *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996); *Dalton v. Pataki*, 11 A.D.3d 62, 83, 780 N.Y.S.2d 47, 65 (App. Div. 3rd Dept. 2004) (the IGRA "preempts the field in the governance of gaming activities on Indian lands.").

36.     The IGRA wholly preempts New York law related to gaming except where a tribe and the State enter into a compact.  *Dalton*, 11 A.D.2d at 84 (a compact "affords the state the opportunity to assert authority over gaming on Indian lands, a power that the state otherwise lacks.").

37.     Further, the IGRA requires that any Class III gaming activities authorized by an ordinance (which, in this case, the Nation has not adopted) must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State.  25 U.S.C. § 2710(d)(1)(C).  Any such Tribal-State compact must meet the requirements under 25 U.S.C. § 2710(d)(3)(C) and be approved by the Secretary of Interior and published in the Federal Register. 25 U.S.C. 2710(d)(3).

38.     New York does not have a compact with the Nation, and therefore New York has no authority over the Nation's gaming.

**D.  New York State lottery vending machines and the Jackpocket Mobile App Operating within the Nation's Reservation**

39.     NYSGC administers all aspects in regards to the State lottery, including the licensing of lottery sales agents, use of vending machines, safekeeping operations and control, and distribution of lottery tickets.  9 NYCRR § 5000.1.

40.     Upon information and belief, New York State offers two types of gaming within the Nation's Reservation.

41.     First, upon information and belief, New York State lottery vending machines are operating within the Nation's Reservation. New York State lottery vending machines provide access to play a type of game known as an instant lottery game established under N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 9, § 5006.1.  Such games are commonly known as "scratch-off games."  *See* https://nylottery.ny.gov/scratch-off-games/.

10

42.     An instant lottery game, or "scratch-off game", is played by removing the rub-off coating from play spots.  9 NYCRR § 5006.2.  The rub-off coating covering the play area on the ticked is to be rubbed off to determine winning or losing status as described in the appropriate game brochure.  9 NYCRR § 5006.5.

43.     The instant lottery game offered by the New York State lottery vending machines is a type of Class III Gaming.

44.     Operating New York State lottery vending machines within the Nation's Reservation violates the IGRA.

45.     Second, New York State lottery terminals are operating within the Nation's Reservation.  Such lottery terminals dispense tickets for various "draw games" such as New York Lotto, New York PowerBall, New York Mega Millions, and several other similar games.  *See* https://nylottery.ny.gov/draw-games/.  Such games provide chances to win based on matching the winning numbers selected during a live statewide televised drawing several times per week.

46.     The draw games offered for play on NYSGC terminals is a type of Class III Gaming.

47.     Operating NYSGC terminals within the Nation's Reservation violates the IGRA.

48.     Finally, upon information and belief, NYSGC issued a Lottery Courier Service License to Jackpocket Inc. on or about March 31, 2023, which has been renewed multiple times, License Number COURIER-001.01 a copy of the current license is annexed as **Exhibit B**.

49.     Upon information and belief, Jackpocket offers its users access to play the New York Lotto and other NYSGC licensed draw games via the Jackpocket mobile app.

50.     Upon information and belief, Jackpocket is now operating on mobile devices throughout New York State and within the Nation's Reservation.

51.     The New York Lotto and similar draw games are a type of Class III Gaming.

52.     Jackpocket's operations as a mobile seller of draw game tickets within the Nation's Reservation violates the IGRA.

## CLAIMS FOR RELIEF

### COUNT I: DECLARATORY JUDGMENT
**(As It Relates To New York State Lottery Vending Machines)**
**(Against all Defendants except Defendant Jackpocket)**

53.     The Nation repeats and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

54.     The Nation seeks and is entitled to a declaration that Defendants, excluding Jackpocket, are violating the IGRA by operating New York State lottery vending machines and terminals within the Nation's Reservation.

55.     Upon information and belief, New York State lottery vending machines are operating within the Nation's Reservation to dispense instant lottery games or "scratch-off games".

56.     Upon information and belief, New York State lottery terminals are also operating within the Nation's Reservation.  Such lottery terminals dispense tickets for various "draw games" such as New York Lotto, New York PowerBall, New York Mega Millions, and several other similar games.

57.     Both instant lottery games and draw games are a type of Class III Gaming.

58.     NYSGC's operation of such games within the Nation's Reservation violates the IGRA.

### COUNT II: INJUNCTION
**(As It Relates To New York State Lottery Vending Machines)**
**(Against all Defendants except Defendant Jackpocket)**

59.     The Nation repeats and re-alleges the allegations contained in all preceding

paragraphs as if fully set forth herein.

60.    The Nation is entitled to an injunction directing all Defendants except Defendant Jackpocket to cease the operation of any New York State lottery vending machines and lottery terminals within the Reservation.

61.    The continued operation of the New York State lottery vending machines and lottery terminals within the Reservation violates the IGRA.

62.    The Nation is suffering and will continue to suffer irreparable harm without injunctive relief because its rights and authority to regulate Class III Gaming within its Reservation continues to be ignored and invalidated.

63.    The balance of equities favors the Nation, as the Defendants will not suffer any legally cognizable harm from an injunction enforcing federal law, while the Nation will suffer irreparable harm in the absence of such an injunction.

64.    An injunction is in the public interest because compliance with federal law governing Class III Gaming on Indian lands is in the public interest.

### COUNT III: DECLARATORY JUDGMENT
**(As It Relates To Issuance of Lottery Courier License to Jackpocket)**
**(Against all Defendants excluding Jackpocket)**

65.    The Nation repeats and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

66.    The Nation seeks and is entitled to a declaration that Defendants, excluding Jackpocket, violated the IGRA by issuing Jackpocket Inc. a Lottery Courier Service License permitting it to operate a mobile app that offers access to play the New York lotto within the Nation's Reservation.

67.    Finally, upon information and belief, NYSGC issued a Lottery Courier Service

13

License to Jackpocket Inc. on or about March 31, 2023, License Number COURIER-001.01. *See* Exhibit B.

68.     Upon information and belief, Jackpocket offers its users access to play the New York Lotto and other NYSGC licensed draw games via the Jackpocket mobile app.

69.     Upon information and belief, Jackpocket is now operating on mobile devices throughout New York State and within the Nation's Reservation.

70.     The New York Lotto and similar draw games are a type of Class III Gaming.

71.     Jackpocket's operations as a mobile seller of draw game tickets within the Nation's Reservation violates the IGRA.

### COUNT IV: INJUNCTION
**(As It Relates To Issuance of Lottery Courier License to Jackpocket Inc.)**
**(Against Defendant Jackpocket)**

72.     The Nation repeats and re-alleges the allegations contained in all preceding paragraphs as if fully set forth herein.

73.     The Nation is entitled to an injunction directing Defendant Jackpocket to cease offering its service within the Nation's Reservation.

74.     The continued operation of Jackpocket's service within the Nation's Reservation violates the IGRA.

75.     The Nation is suffering and will continue to suffer irreparable harm without injunctive relief because its rights and authority to regulate Class III Gaming within its Reservation continues to be ignored and invalidated.

76.     The balance of equities favors the Nation, as the Defendants will not suffer any legally cognizable harm from an injunction enforcing federal law, while the Nation will suffer irreparable harm in the absence of such an injunction.

14

77.     An injunction is in the public interest because compliance with federal law governing Class III Gaming on Indian lands is in the public interest.

## RELIEF REQUESTED

**WHEREFORE**, in accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the general principles of equity, the Nation respectfully seeks:

**A.**  A declaration that Defendants, excluding Jackpocket, violated the IGRA by operating New York State lottery vending machines within the Nation's Reservation;

**B.**  An injunction directing Defendants, excluding Jackpocket, to cease operating any New York State lottery vending machines within the Nation's Reservation;

**C.**  A declaration that Defendants, excluding Jackpocket, violated the IGRA by issuing the Lottery Courier Service License to Jackpocket without excluding the Nation's Reservation;

**D.**  A declaration that that portion of the Lottery Courier Service License issued to Jackpocket (License Number COURIER-001.01) allowing Jackpocket to operate within the Nation's Reservation is invalid;

**E.**  An injunction directing Defendant Jackpocket to cease operating within the Nation's Reservation;

**F.**  Such further necessary or proper relief as the Court may see fit to grant in conjunction with the declaratory and injunctive relief requested herein;

**G.**  All costs and fees allowed by law; and

**H.**  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure 38(b), the Nation respectfully demands a

15

27633436.4

trial by jury of all issues triable by a jury.

Dated: April 18, 2024

**BARCLAY DAMON LLP**

By: _____

     David G. Burch, Jr.
     Kyra E. Ganswith
125 East Jefferson Avenue
Syracuse, New York 13202
Tel: (315) 425-2788
dburch@barclaydamon.com
kganswith@barclaydamon.com

*Attorneys for Plaintiff Cayuga Nation*

16