**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CAYUGA NATION, *a federally recognized Indian Nation*,

                             Plaintiff,                    5:24-cv-537 (BKS/TWD)

v.

NEW YORK STATE GAMING COMMISSION, BRIAN
O'DWYER, in his official capacity as the Chair and
Commissioner of the New York State Gaming
Commission, JOHN A. CROTTY, SYLVIA B. HAMER,
MARTIN J. MACK, PETER J. MOSCHETTI, JR.,
MARISSA SHORENSTEIN, JERRY SKURNIK, in their
official capacities as Commissioners of the New York State
Gaming Commission, and JACKPOCKET INC.,

                             Defendants.

---

**Appearances:**

*For Plaintiff:*
David G. Burch, Jr.
Barclay Damon LLP
125 East Jefferson Street
Syracuse, NY 13202

Kyra E. Ganswith
Barclay Damon LLP
80 State Street
Albany, NY 12207

*For Defendants New York State Gaming Commission, Brian O'Dwyer, John A. Crotty, Sylvia B.*
*Hamer, Martin J. Mack, Peter J. Moschetti, Jr., Marissa Shorenstein, and Jerry Skurnik:*
Letitia James
Attorney General of the State of New York
Aimee Cowan
Assistant Attorney General
300 South State Street, Suite 300
Syracuse, NY 13202

*For Defendant JackPocket, Inc.:*
Andrew Kim
Goodwin Procter LLP
1900 N Street N.W.
Washington, D.C. 20036

Chenxi Jiao
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018

Christopher J.C. Herbert
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Cayuga Nation (the "Nation"), a federally recognized Indian Nation, brings this action for declaratory and injunctive relief against the New York State Gaming Commission; Brian O'Dwyer, in his official capacity as Chair and Commissioner of the NYSGC; John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Peter J. Moschetti, Jr., Marissa Shorenstein, and Jerry Skurnik, in their official capacities as Commissioners of the NYSGC; and JackPocket, Inc. (Dkt. No. 30). The Nation alleges that the Commission and the Commissioners (together, the "State Defendants") are violating the Indian Gaming Regulatory Act (IGRA) by operating New York State lottery vending machines within the boundaries of the Cayuga Nation Reservation and by allowing JackPocket to operate within the Reservation pursuant to a Lottery Courier Service License. (*Id.*). Currently before the Court is the State Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Dkt. No. 37). The motion is fully briefed. (Dkt. Nos. 37-1, 42,

47). The Court heard oral argument on the motion on March 27, 2025. For the following reasons, the Court grants the State Defendants' motion to dismiss in part and denies it in part.

## II.    BACKGROUND

### A.    IGRA

IGRA was enacted following the Supreme Court's 1987 decision in *California v. Cabazon Band of Mission Indians*, "which held that States lacked any regulatory authority over gaming on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014); *see also California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 221–22 (1987). In its "Declaration of policy" IGRA names the following three purposes for the law's enactment:

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702.

"The Act divides gaming on Indian lands into three classes—I, II, and III—and provides a different regulatory scheme for each class." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 48 (1996). Class I gaming "means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal

ceremonies or celebrations." 25 U.S.C. § 2703(6). IGRA places "[c]lass I gaming on Indian

lands" "within the exclusive jurisdiction of the Indian tribes." *Id.* § 2710(a)(1).

Class II gaming refers to bingo, "including (if played in the same location) pull-tabs,

lotto, punch boards, tip jars, instant bingo, and other games similar to bingo," as well as certain

card games, but does not include "any banking card games, including baccarat, chemin de fer, or

blackjack (21)," or "electronic or electromechanical facsimiles of any game of chance or slot

machines of any kind." *Id.* § 2703(7). IGRA states that "[a]n Indian tribe may engage in, or

license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if" "such

Indian gaming is located within a State that permits such gaming for any purpose by any person,

organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands

by Federal law)" and "the governing body of the Indian tribe adopts an ordinance or resolution

which is approved by the Chairman [of the National Indian Gaming Commission]." *Id.* §

2710(b)(1). Class II gaming is subject to additional regulations, including, for example,

restrictions on revenue purposes, audit requirements, and background investigations on certain

personnel affiliated with a gaming enterprise. *See id.* § 2710(b).

Class III gaming includes "all forms of gaming that are not class I gaming or class II

gaming." *Id.* § 2703(8). This category "includes casino games, slot machines, and horse racing."

*Bay Mills Indian Cmty.*, 572 U.S. at 785 (citing 25 U.S.C. § 2703(8)). Class III gaming "is the

most heavily regulated of the three classes" and:

> is lawful only where it is: (1) authorized by an ordinance or
> resolution that (a) is adopted by the governing body of the Indian
> tribe, (b) satisfies certain statutorily prescribed requirements, and (c)
> is approved by the National Indian Gaming Commission; (2) located
> in a State that permits such gaming for any purpose by any person,
> organization, or entity; and (3) "conducted in conformance with a
> Tribal–State compact entered into by the Indian tribe and the State
> under paragraph (3) that is in effect."

4

*Seminole Tribe*, 517 U.S. at 48–49 (citing 25 U.S.C. § 2710(d)(1)). A Tribal-State compact "typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms." *Bay Mills Indian Cmty.*, 572 U.S. at 785 (citing 25 U.S.C. §§ 2710(d)(3)(C)(ii), (v)).

### B.     Facts[1]

The Treaty of Canandaigua in 1794 established the Reservation, consisting of 64,015 acres, in what are today known as Seneca County, New York and Cayuga County, New York. (Dkt. No. 30, ¶¶ 29–30). Congress has not disestablished the Reservation or authorized the sale of its lands and thus the Reservation remains intact. (*Id.* ¶¶ 33–34). The Nation has adopted a Class II gaming ordinance. (*Id.* ¶ 39; *see also* Dkt. No. 30-1). The Nation has not adopted a Class III gaming ordinance, nor has it entered into a Tribal-State Compact with New York State. (Dkt. No. 30, ¶¶ 39–44).

The Commission "is a state agency that regulates gaming activities in New York State," (*id.* ¶ 8), and "administers all aspects in regards to the State lottery, including the licensing of lottery sales agents, use of vending machines, safekeeping operations and control, and distribution of lottery tickets," (*id.* ¶ 45 (citing 9 N.Y.C.R.R. § 5000.1)). New York State operates lottery vending machines and lottery terminals on the Reservation. (*See id.* ¶¶ 46–47, 51). New York State lottery machines provide players with instant lottery games, more commonly known as "scratch-off games," which are played "by removing the rub-off coating from play spots" "to determine winning or losing status as described in the appropriate game brochure." (*Id.* ¶¶ 47–48 (citing 9 N.Y.C.R.R. §§ 5006.1, 5006.2, 5006.5)). New York State

---

[1] The facts are drawn from the Nation's amended complaint, (Dkt. No. 30), as well as the attached exhibits. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

lottery terminals provide players with "tickets for various 'draw games' such as New York Lotto, New York PowerBall, New York Mega Millions, and several other similar games" which "provide chances to win based on matching the winning numbers selected during a live statewide televised drawing several times per week." (*Id.* ¶ 51).

Additionally, on or around March 31, 2023, the Commission issued a Lottery Courier Service License to JackPocket. (*Id.* ¶ 54; *see also* Dkt. No. 30-2). JackPocket allows users of its mobile app to play the New York Lotto and other draw games, including while on the Reservation. (Dkt. No. 30, ¶¶ 57–58). The License was renewed on or around April 1, 2024, (*id.* ¶ 55; *see also* Dkt. No. 30-3), and on or around May 23, 2024, (Dkt. No. 30, ¶ 56; *see also* Dkt. No. 30-4). The most recently renewed License is set to expire May 23, 2029. (Dkt. No. 30, ¶ 56; *see also* Dkt. No. 30-4).

## III.    STANDARD OF REVIEW

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49, 2021 WL 5040236, at *3, 2021 U.S. Dist. LEXIS 209018, at *8 (N.D.N.Y. Oct. 29, 2021) (citation omitted). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true[ ] and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are

insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.    DISCUSSION

The State Defendants seek to dismiss the Nation's complaint for lack of subject matter jurisdiction, on the grounds that they are immune from suit under the Eleventh Amendment, and also for failure to state a claim. (*See generally* Dkt. No. 37-1); *see also Arjent LLC v. U.S. S.E.C.*, 7 F. Supp. 3d 378, 383 (S.D.N.Y. 2014) ("[B]ecause sovereign immunity is 'jurisdictional in nature,' questions of sovereign immunity implicate a court's subject matter jurisdiction and are analyzed under Rule 12(b)(1)." (citing *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007))). Accordingly, the Court begins its discussion by addressing the State Defendants' arguments under the Eleventh Amendment. *See Mann*, 2021 WL 5040236, at *3, 2021 U.S. Dist. LEXIS 209018, at *8.

### A.    Eleventh Amendment Immunity

The State Defendants argue that "[t]he Nation cannot proceed with its action against the State defendants in federal court because the Eleventh Amendment renders them immune from suit." (Dkt. No. 37-1, at 11). The Nation contends that the individual Commissioners are not immune from suit under the *Ex parte Young* doctrine and that because of this the Commission itself may also be sued. (Dkt. No. 42, at 13–21).

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[E]ach State is a sovereign entity in our federal system" and "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe*, 517 U.S. at 54 (internal quotation marks omitted) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). Accordingly, "a federal court generally may not hear a suit brought by any person against a nonconsenting State," *Allen v. Cooper*, 589 U.S. 248, 254 (2020), a principle which extends to suits against states brought by Indian tribes, *see Seminole Tribe*, 517 U.S. at 55 (*citing Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 782 (1991)). Additionally, "[t]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)).

"There are three exceptions to Eleventh Amendment immunity": "this protection does not apply if (1) a state waives its immunity; (2) Congress clearly abrogates state sovereign immunity; or (3) the suit is against a state official and seeks prospective relief." *Unkechaug Indian Nation v. N.Y. State Dep't of Env't Conservation*., 677 F. Supp. 3d 137, 147 (E.D.N.Y. 2023) (citing *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 254–55 (2011)), *aff'd sub nom. Unkechaug Indian Nation v. Seggos*, 126 F.4th 822. This third exception, otherwise known as the *Ex parte Young* doctrine, provides for "federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of

federal law.'" *Seminole Tribe*, 517 U.S. 44 at 73 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985).

The Nation does not contest that the State of New York has not consented to suit, nor does the Nation claim that Congress has abrogated state sovereign immunity in this instance. (*See generally* Dkt. No. 42, at 13–21). The Court therefore does not address these issues, as raised by Defendants, further. (*See* Dkt. No. 37-1, at 12–14 (arguing that the Commission "has not consented to suit in federal court" and that "Congress did not abrogate state sovereign immunity be enacting the IGRA")). However, the Nation does challenge Defendants' contention that *Ex parte Young* does not permit an action against the individual commissioners and the Commission itself. (Dkt. No. 42, at 13–21).

### 1.    The Individual Commissioners

#### a.    *Ex Parte Young* and IGRA

The parties dispute whether the Supreme Court's decision in *Seminole Tribe of Florida v. Florida* precludes the Nation's claim against the individual Commissioners under *Ex parte Young*.

In *Seminole Tribe*, the Seminole Tribe of Florida alleged that the State of Florida and its Governor violated IGRA's requirement that the state partake in a good faith negotiation under Section 2710(d)(3)(A) with respect to negotiating a Tribal-State Compact. 517 U.S. at 51–52. The Seminole Tribe brought the suit pursuant to Section 2710(d)(7)(A) of IGRA, which grants federal jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact . . . or to conduct such negotiations in good faith." *See id.* at 52. In response, Florida invoked its sovereign immunity. *Id.*

On review, the Supreme Court first considered whether "the Eleventh Amendment prevent[s] Congress from authorizing suits by Indian tribes against States for prospective injunctive relief to enforce legislation enacted pursuant to the Indian Commerce Clause," *id.* at 53, holding "that notwithstanding Congress' clear intent to abrogate the States' sovereign immunity, the Indian Commerce Clause does not grant Congress that power, and therefore § 2710(d)(7) cannot grant jurisdiction over a State that does not consent to be sued, *id.* at 47; *see also id.* at 55–73.

The Court then considered the question of whether "the doctrine of *Ex parte Young* permit[s] suits against a State's Governor for prospective injunctive relief to enforce the good-faith bargaining requirement of the Act," *id.* at 53, holding that the doctrine "may not be used to enforce § 2710(d)(3) against a state official," *id.* at 47. In its discussion of why *Ex parte Young* could not be a vehicle for the Seminole Tribe's suit, the Court reasoned that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Id.* at 74. The Court then explained that "Congress intended § 2710(d)(3) to be enforced against the State in an action brought under § 2710(d)(7)," that "the intricate procedures set forth in that provision show that Congress intended therein not only to define, but also to limit significantly, the duty imposed by § 2710(d)(3)," and that "[i]f § 2710(d)(3) could be enforced in a suit under *Ex parte Young*, § 2710(d)(7) would have been superfluous." *Id.* at 74–75.

The State Defendants argue that "the Seminole Tribe could not simply sue Florida officials to obtain the same relief it could not obtain from Florida itself, *i.e.* an order compelling the State to negotiate a gaming compact pursuant to the IGRA." (Dkt. No. 37-1, at 15 (citing

*Seminole Tribe*, 517 U.S. at 74, 76)). They continue, "[t]he Court observed that, through the IGRA, Congress created both the right the Seminole Tribe was asserting—to engage in good-faith negotiations with a state over a gaming compact—and the mechanisms to enforce that right." (*Id.* (citing *Seminole Tribe*, 517 U.S. at 74, 76)). And "[g]iven that Congress had endeavored to detail the process as to how disputes of this nature are to be addressed, the Court concluded that permitting an alternative action under *Ex parte Young* would render those statutes superfluous." (*Id.* (citing *Seminole Tribe*, 517 U.S. at 75)).

In response, the Nation contends that "Seminole Tribe did not limit the availability of Ex Parte Young for all violations of IGRA, rather, it held that 'Ex Parte Young[] may not be used to enforce 25 U.S.C. § 2710(d)(3) against a state official.'" (Dkt. No. 42, at 14 (citing *Seminole Tribe*, 517 U.S. at 47)). Thus, the Nation argues that "*Seminole Tribe* does not bar Ex Parte Young availability for all IGRA violations," and that the Nation may rely on *Ex parte Young* here because the remedial scheme contained within IGRA does not cover the current dispute. (*Id.* at 14–15 ("Section 2710(7)(b) provides that an Indian tribe can commence an action if a compact was not entered, the State did not respond to the request to enter into a compact, or did not respond in good faith. . . . Here, the Nation does not allege there were bad faith negotiations with the State, or that the Nation had a desire to compel negotiations for a compact.")).

The Court agrees with the Nation that *Seminole Tribe* does not indicate that all suits brought under IGRA and pursuant to *Ex parte Young* are barred, but rather, that *Ex parte Young* may not be used to bring an action under IGRA to enforce 25 U.S.C. § 2710(d)(3) or in other instances "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right." 517 U.S. at 74; *see also Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1289 (11th Cir. 2015) (explaining that *Seminole Tribe* "neither addressed

nor decided whether state and tribal officials are immune from other IGRA-based claims to enforce rights for which the statute does not set forth such a detailed, limited remedial scheme"). Courts have found that in the absence of a detailed remedial scheme, *Seminole Tribe* does not operate as a bar to an *Ex parte Young* action to enforce IGRA. *See Friends of Amador Cnty. v. Salazar*, No. 10-cv-348, 2010 WL 4069473, at *4, 2010 U.S. Dist. LEXIS 110448, at *11–12 (E.D. Cal. Oct. 18, 2010); *Tohono O'Oodham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1312–13 (D. Ariz. 2015); *PCI Gaming Auth.*, 801 F.3d at 1289–90.

Here, the Nation specifically seeks to enforce the regulations regarding Class III gaming provisions against the State Defendants, a situation that Section 2710(d)(3) does not address. Moreover, the Nation is correct that "IGRA does not contemplate a regulatory scheme, or provide any guidance for recourse, when Indian nations do not wish to negotiate a compact, but rather request the violations stop." (Dkt. No. 42, at 15 (citing 25 U.S.C. § 2710(d)(7))). The State Defendants do not explain how such a situation is comparable to the one at issue in *Seminole Tribe*, nor do they explain how the statute otherwise provides a remedy in these circumstances. Accordingly, the Court does not find the Nation's action to be barred under *Seminole Tribe*'s restriction on the use of the *Ex parte Young* exception.

###### b.    Prospective Relief

The State Defendants also argue that the Nation cannot rely on *Ex parte Young* to sue the individual Commission members because the Nation is seeking retrospective relief. (Dkt. No. 37-1, at 16–18; Dkt. No. 47, at 8–9). The Nation contends that the relief sought is prospective only. (Dkt. No. 42, at 16–20).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)

(quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J.,

concurring in part and concurring in the judgment)); *T.W. v. N.Y. State Bd. of Law Exam'rs*, 110

F.4th 71, 91 (2d Cir. 2024) (quoting *Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020)).

"[S]ubstance rather than . . . the form of the relief sought" determines whether the relief is

prospective. *Vega*, 963 F.3d at 282 (citing *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)).

"[R]elief that is 'tantamount to an award of damages for a past violation of federal law, even

though styled as something else,' is barred. Importantly, however, 'relief that serves directly to

bring an end to a present violation of federal law is not barred by the Eleventh Amendment even

though accompanied by a substantial ancillary effect on the state treasury.'" *Id.* (quoting

*Papasan v. Allain*, 478 U.S. 265, 278 (1986)).

Here, the Nation alleges three ongoing violations of federal law: first, the operation of

lottery vending machines providing access to instant lottery or "scratch-off games" within the

Reservation; second, the operation of lottery terminals providing access to "draw games" within

the Reservation; and third, allowing JackPocket to operate its mobile app providing access to

draw games pursuant to the Lottery Courier License, which is currently in effect and expires on

May 23, 2029, within the Reservation. (*See* Dkt. No. 30, ¶¶ 47, 49–54, 56–60, 67–71, 74, 81–82,

84–86). The Nation seeks the following in terms of relief from the State Defendants: "a

declaration that [the State Defendants] are currently violating federal law by operating New York

State lottery vending machines within the Nation's Reservation"; "an injunction directing [the

State Defendants] to cease operating any New York State lottery vending machines within the

Nation's Reservation"; "a declaration that [the State Defendants] violate IGRA by allowing the

issued the [sic] Lottery Courier Service License to Jack[P]ocket to be in effect currently without

excluding the Nation's Reservation and continue to violate the law with the License in effect";
and "a declaration that the portion of the current Lottery Courier Service License issued to
Jack[P]ocket (License Number COURIER-005), which [the Commission] allows to currently
stay valid, allowing Jack[P]ocket to operate within the Nation's Reservation is invalid." (Dkt.
No. 30, ¶ 5).

The Nation's request for injunctive relief, aimed at ending an alleged ongoing violation
of federal law, is a request for prospective relief. *See Verizon Md., Inc.*, 535 U.S. at 645 (stating
that the plaintiff's "prayer for injunctive relief—that state officials be restrained from enforcing
an order in contravention of controlling federal law—clearly satisfies our 'straightforward
inquiry'"). And the Nation's request for declaratory relief, which "[i]nsofar as the exposure of
the State is concerned . . . adds nothing to the prayer for injunction.". *See id.* at 646.

The State Defendants assert several reasons why the relief is retrospective. All of them
are unavailing. First, they state that because the Nation's "original complaint phrased its requests
for declaratory relief in the past tense," the declaratory relief sought is actually retrospective.
(Dkt. No. 37-1, at 17). As the Nation correctly points out, "the motion to dismiss is to only be
decided on the allegations in the Amended Complaint." (Dkt. No. 42, at 16 (citation omitted));
*see Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998)
("[I]t is well established that an amended complaint ordinarily supercedes the original and
renders it of no legal effect." (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d
Cir. 1994))). But moreover, the fact that the declaratory relief sought speaks to past violations
does not mean that a plaintiff seeking such relief cannot proceed under an *Ex parte Young*
theory. As the Supreme Court explained in *Verizon Maryland, Inc. v. Public Service Commission
of Maryland*, "no past liability of the State, or of any of its commissioners, is at issue. [The

declaratory relief sought] does not impose upon the State 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.'" 535 U.S. at 646.

Next, relying on the Second Circuit's decision in *Ward v. Thomas*, the State Defendants argue that "any violations of federal law alleged against the Commission member defendants have already occurred" because "[t]he 'operation' of the lottery instrumentalities alleged in the amended complaint cannot be divorced from the Commission's determinations that particular lottery sales agents satisfy regulatory requirements to sell lottery tickets on their premises— determinations that the Commission has already made at discrete points in time," and thus "an injunction against 'continued operation' of the lottery instrumentalities would in substance reverse those prior determinations." (Dkt. No. 37-1, at 17). "Similarly," they argue, "an injunction with respect to the Commission's licensing of Jack[P]ocket as a lottery courier service is nothing less than the annulment of the licensing determination on the ground that the Commission misapplied the law in the past." (*Id.*).

As the Nation points out, (Dkt. No. 42, at 18), Defendants' reliance on *Ward* is inapposite. *Ward* involved claims by a plaintiff sub-class for declaratory and "notice relief" regarding a reduction in benefits pursuant to a program that was later terminated. 207 F.3d 114, 116–17, 119 (2d Cir. 2000). The court found that, as in *Green v. Mansour*, 474 U.S. 64 (1985), "though the recipients framed their prayer for relief in prospective terms, the effect of what they sought would be entirely retrospective because the state was no longer violating federal law." *Id.* at 119–20 (citing *Green*, 474 U.S. at 71–73). The court explained that with respect to the declaratory relief sought, "a declaration that Connecticut's . . . policy violated federal law would have its use if it was 'offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution

would be computed,'" thereby essentially acting as a "'partial "end run" around' the Eleventh Amendment's bar on retrospective awards of monetary relief." *Id.* at 120 (citing *Green*, 474 U.S. at 73).

These circumstances are not comparable. There is no suggestion that the relief sought would amount to an end run around the Eleventh Amendment in a similar way. As for the more specific argument regarding administrative actions, Defendant cites no case law suggesting that relief to prohibit ongoing activity that had previously been authorized is retrospective because it would effectively invalidate those earlier authorizations. Accordingly, the Court does not find that it would be improper to pursue this action pursuant to *Ex parte Young*.

### 2.    The Commission

Defendants argue that the Eleventh Amendment bars suit against the Commission, a state agency. (Dkt. No. 37-1, at 12–14). The Nation responds that "[t]he Commission is not entitled to Eleventh Amendment [i]mmunity because the Commissioners are sued herein" and that because "the real party [in] interest is the government entity, not the named official," "the Commission is a proper background party that must remain in this case." (Dkt. No. 42, at 20–21 (citation omitted)).

The Court agrees with Defendants. As Defendants state, (Dkt. No. 37-1, at 13), the Commission is a state agency that is generally immune from suit, *see Matsko v. New York*, No. 18-cv-857, 2022 WL 137724, at *12–13, 2022 U.S. Dist. LEXIS 7996, at *34–35 (N.D.N.Y. Jan. 14, 2022) (granting summary judgment in favor of the defendants, including the Commission, on the basis that they were entitled to sovereign immunity with respect to the plaintiff's New York State Human Rights Law claim). Neither of the cases the Nation cites with respect to this argument support the proposition that a state agency may be made a proper party to the suit because its constituent members are simultaneously sued pursuant to *Ex parte Young*. (Dkt. No.

42, at 20–21 (citing *Malek v. N.Y. Unified Ct. Sys.*, Nos. 22-cv-5416, 22-cv-6515, 22-cv-6538,

22-cv-6775, 22-cv-7815, 2023 WL 2429528, 2023 U.S. Dist. LEXIS 40167 (E.D.N.Y. Mar. 9,

2023) and *Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012) (Kavanaugh, J.)).

The Nation's concern, which appears to be that any relief sought would not bind later officials, is

resolved by suing the individual Commissioners in their official capacity, as explained by one of

the cases the Nation cites. *See Vann*, 701 F.3d at 929 ("[A]n injunction entered against an officer

in his official capacity is binding on the officer's successors." (citations omitted)). Accordingly,

the Commission must be dismissed from this action.

### B.    Private Right of Action and Equity Jurisdiction

The State Defendants argue that "[e]ven if this Court retained jurisdiction over any

portion of the action," "it should still dismiss all claims against them because the IGRA does not

confer upon the Nation a private right of action to enforce the rights they assert." (Dkt. No. 37-1,

at 18). The Nation does not dispute that IGRA does not confer a private of action[2] to pursue the

relief it seeks, but argues that "this case involves traditional equitable relief against government

officials under Ex Parte Young," and thus that "the Nation's claims fall squarely within the

federal courts' long-established authority to enjoin ongoing violation of federal law." (Dkt. No.

42, at 24–25).

In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court considered the

question of "whether Medicaid providers [could sue Idaho state officials] to enforce § (30)(A) of

the Medicaid Act." 575 U.S. 320, 322–24 (2015). The Court made clear that the Supremacy

Clause did not confer a private right of action to enjoin the state's implementation of Section

---

[2] IGRA directly provides several rights of action, including under Section 2710(d)(7)(A). None of these rights of action includes the type of relief sought here. *See* 25 U.S.C. § 2710(d)(7)(A).

(30)(A), *id.* at 324–25, but that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* at 327 (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)). The Court than analyzed whether the suit could proceed in equity. *Id.* (citing *Seminole Tribe*, 517 U.S. at 74).

The State Defendants do not address whether the Nation can proceed in equity jurisdiction, even absent a private right of action in IGRA itself. Instead, in their reply, the State Defendants respond that the Nation cannot "rely on federal preemption as the source of an enforceable substantive right," (Dkt. No. 47, at 11), an argument that the Court does not understand the Nation to assert. The State Defendants also argue that "the Supremacy Clause remains available to any Indian tribe aggrieved by the enforcement of a state or local law against it that conflicts with the IGRA," but that "the Nation here does not identify a law that is preventing the tribe from engaging in activity the IGRA permits the tribe to conduct." (*Id.*). This fundamentally misunderstands the Nation's claim, which specifically seeks to prevent *the State* from engaging in or permitting the occurrence of particular games in contravention of IGRA's restrictions on Class III gaming. (*See* Dkt. No. 30, ¶¶ 35–86).[3]

At least one other district court has declined to dismiss a plaintiff tribe's IGRA preemption claim on the basis that the court lacked equity jurisdiction. *See Tohono O'Oodham Nation*, 130 F. Supp. 3d at 1316 (explaining that the court was "not convinced that Congress

---

[3] In their opening brief, the State Defendants argue that "the Nation asserts broadly that the State Defendants violated 'the IGRA,' without reference to any specific subdivisions," (Dkt. No. 37-1, at 18), and later in reply make this argument again, stating "the Nation leaves the court to guess which provisions in the IGRA it would like to enforce against the State Defendants." (Dkt. No. 47, at 9). While Plaintiff does frequently refer to violations of "the IGRA," (*see* Dkt. No. 30, ¶¶ 50, 53, 71, 86), it is also clear in the amended complaint that the specific provisions Plaintiff alleges the State Defendants are violating are those regulating Class III gaming, (*see, e.g.*, Dkt. No. 30, ¶¶ 35–44, 49–50, 52–53, 59–60). The State Defendants themselves seem to acknowledge this. (Dkt. No. 47, at 9 (stating that "the heart of the Nation's lawsuit is a perceived right to regulate all Class III gaming within the borders of its ancestral reservation").

intended to foreclose an equitable cause of action asserting preemption," that "[t]he Supreme Court recognized the existence of such a cause of action in *Armstrong*, and [the relevant defendant] ha[d] cited no IGRA provision that shows a congressional intent to foreclose it."). Here, the parties have not meaningfully addressed whether the Court has equitable jurisdiction. In light of this case law, and absent further briefing addressing the relevant considerations, the Court cannot resolve the question of whether Congress "'inten[ded] to foreclose' equitable relief." *See Armstrong*, 575 U.S. at 328 (finding that "Congress's 'intent to foreclose' equitable relief" was evidenced by the provision of a "sole remedy" "for a State's failure to comply with Medicaid's requirements" and the "judicially unadministrable nature of § 30(A)'s text"); *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 145–47 (2d Cir. 2016) (considering the factors discussed in *Armstrong* and finding that the Airport Noise and Capacity Act of 1990 did not preclude the Court from issuing equitable relief). The Court therefore denies the State Defendants' motion on this ground without prejudice to renewal.

### C.    State Gaming on Indian Lands

The State Defendants' final argument for dismissing the Nation's complaint is that "the IGRA simply does not apply to the state-operated lotteries the Nation identifies as a violation of its rights," stating that "[t]he structure and language of the IGRA demonstrate that the statute is intended to regulate whether and how *Indian* gaming on Indian lands may be effected." (Dkt. No. 37-1, at 20). The Nation responds that in taking this position, the State Defendants "rely exclusively" on non-precedential case law and that Second Circuit case law "consistently and unequivocally holds that IGRA preempts all state and local legislation and regulation related to gaming conducted on Indian lands, not just Indian gaming activities on Indian lands." (Dkt. No. 42, at 25–30).

Whether IGRA's regulatory regime was meant to apply to state gaming on Indian lands is a question of statutory interpretation. "Every exercise in statutory construction must begin with the words of the text." *New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 216 (2d Cir. 2021) (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)). "The words of the text to be interpreted are not considered alone, however. Instead, we 'look[] to the statutory scheme as a whole and plac[e] the particular provision within the context of that statute.'" *Id.* (quoting *Saks*, 316 F.3d at 345). "If the text of the statute 'is not entirely clear, we then turn to the broader statutory context and its history.'" *Id.* (quoting *Khalid v. Sessions*, 904 F.3d 129, 132 (2d Cir. 2018)); *accord Cayuga Nation v. Tanner*, 6 F.4th 361, 378 (2d Cir. 2021) ("In interpreting a statute, we look first to the language of the statute itself. When the language of the statute is unambiguous, judicial inquiry is complete." (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289–90 (2d Cir. 2002))).

The text of section 2710(d)(1) reads as follows:

> (1) Class III gaming activities shall be lawful on Indian lands only if such activities are—
> (A) authorized by an ordinance or resolution that—
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
> (ii) meets the requirements of subsection (b), and
> (iii) is approved by the Chairman,
> (B) located in a State that permits such gaming for any purpose by any person, organization, or entity and
> (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1).

This language is unambiguous. The text of the statute refers to "[c]lass III gaming activities" "on Indian lands," and does not differentiate between who is conducting the gaming. *See id.* The definition of class III gaming, which, as stated above, is defined as "all forms of

gaming that are not class I gaming or class II gaming," also does not restrict its meaning to only encompass Indian gaming. *See id.* § 2703(8).

Defendants argue that "[t]he IGRA's text uniformly refers to Indian gaming, that is, gaming operated by a tribe itself or privately operated gaming regulated by a tribe." (Dkt. No. 37-1, at 21). This is, however, not the case. While at some points in IGRA the statute refers to gaming "by Indian tribes" or uses similar wording, (*see, e.g.*, 25 U.S.C. § 2702(1)), at other times the statute refers to gaming "on Indian lands," including, as most relevant here, Section 2710(d)(1). "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally.' We presume that intention here and thus discern no basis to read extratextual limitations into the statute." *Cayuga Nation*, 6 F.4th at 378–79 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

The Defendants rely on the Declaration of Policy section in support of their argument. (Dkt. No. 37-1, at 21). While the first paragraph does state that the purpose of IGRA is "to provide a statutory basis for the operation of gaming by Indian tribes," the third paragraph also makes clear that IGRA's purpose is for "the establishment of Federal standards for *gaming on Indian lands*." 25 U.S.C. §§ 2702(1), (3) (emphasis added). This purpose suggests the statute is not only about gaming that a tribe itself conducts. Moreover, this section also twice emphasizes that the purpose of IGRA is to *benefit* tribes—the operation of such gaming is to be "a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and the Indian tribe is to be the "primary beneficiary of the gaming operation." *Id.* § 2702(1)–(2). The State Defendants' understanding—that the state could conduct its own gaming operations

without complying with IGRA's requirements—would fundamentally undermine those statutory purposes.

The State Defendants also argue that "with respect to the IGRA itself, the text does not contain any reference to State-operated gambling of any kind." (Dkt. No. 37-1, at 21–22). While it is true that IGRA does not refer to State-operated gaming, Congress could have chosen to exclude State-operated gaming from the broad language of Section 2710(d)(1) which generally refers to "class III gaming activities." The Court will not read into the statute an exclusion for State-operated gaming activities. *See Cayuga Nation*, 6 F.4th at 379 ("[W]e have 'no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that . . . Congress must have intended something [narrower].'" (second alteration in original) (quoting *Bay Mills Indian Cmty.*, 572 U.S. at 794)).

Accordingly, given the plain language of IGRA and the fact that Congress could have explicitly said that the State could conduct Class III gaming on Indian land and did not, the Court finds that IGRA's restrictions on class III gaming applies to any class III gaming activity conducted on Indian lands, including gaming activity conducted by the State.

The State Defendants also cite to IGRA's legislative history, including that IGRA was enacted in response to concerns surrounding Indian gaming, that "[t]he IGRA's legislative history is devoid of any specific reference to gaming activity conducted by States," and that "[w]hen the legislative history does refer to States, it is to clarify that 'States are not required to forgo any State governmental rights to engage in . . . Class III gaming except whatever they may voluntarily cede to a tribe under a compact.'" (Dkt. No. 37-1, at 22–23). First, a court "look[s] to the legislative history of a statute only where the text itself is not 'absolutely clear.'" *United States v. DiCristina*, 726 F.3d 92, 102 (2d Cir. 2013) (quoting *Disabled in Action of Metro. N.Y.*

*v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000))). As the Court finds the text unambiguous, there is no need to examine the legislative history here.

As persuasive authority, the State Defendants rely on *Confederated Tribes & Bands of Yakama Indian Nation v. Lowry* ("*Yakama Indian Nation*"), (Dkt. No. 37-1, at 20), in which the district court considered the plaintiff tribe's claim that "the State of Washington operate[d] its lottery on the Yakama Indian Nation Reservation in violation of [IGRA], specifically 25 U.S.C. § 2710(b)(4) and (d)(1)(A)(ii)," 968 F. Supp. 531, 532–33 (E.D. Wash. 1996), *vacated sub nom. Confederated Tribes & Bands of Yakama Indian Nation v. Locke*, 176 F.3d 467 (9th Cir. 1999). In this case, the district court found that "unless Congress specifically says the States' gaming activity is included, States are not subject to IGRA's regulatory provisions," and dismissed the cause of action for failing to state a claim upon which relief could be granted. *Id.* at 537–38. On appeal, the Ninth Circuit panel stated that they "agree[d] with the district court that this claim must be dismissed, but only on the ground of the Eleventh Amendment," and explicitly declined to address the merits of the underlying issue. 176 F.3d at 469–70 ("Because this action is so clearly barred from federal court by the Eleventh Amendment, we deem it an inappropriate vehicle for the determination of the more complex issues raised by the Tribe and responded to by the State. We therefore do not address, and express no opinion on, the questions whether the operation of the state lottery on the Yakama Reservation violates IGRA, and whether, if so, IGRA gives rise to an implied right of action in the Tribe to remedy the condition."). For the reasons set forth above, the Court finds the district court's conclusion in this case (and the State Defendants' arguments based on its reasoning) to be unpersuasive. The Court also notes that in another IGRA case, relied on by the Nation, (*see* Dkt. No. 42, at 26), a district court concluded, after a brief analysis relying primarily on the plain language of Section 2710(d), that a state

23

could not operate its own lottery on tribal lands. *Coeur d'Alene Tribe v. State*, 842 F. Supp. 1268, 1282 (D. Idaho 1994), *aff'd* 51 F.3d 876 (9th Cir. 1995).[4] The district court ruled that "in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity, including the State of Idaho, may conduct Class III gaming on the reservation." *Id.*

The State Defendants make one other argument, namely that "IGRA created 18 U.S.C. § 1166, which explicitly makes clear that, in the absence of a tribal-state compact, state laws pertaining to the licensing and regulation of Class III gambling 'apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.'" (Dkt. No. 37-1, at 23–24 (citing 18 U.S.C. § 1166(a) & (c))). According to the State Defendants, "[t]o that end, Article 34 of the New York Tax Law authorizes and regulates the state-operated New York Lottery—a form of Class III gaming—and there is no compact between the State and the Nation that otherwise addresses the New York Lottery. Therefore, Section 1166(a) applies, making all New York state laws pertaining to the licensing and regulation of the state lottery applicable in Indian country." (*Id.* at 24 (citing *Yakama Indian Nation*, 968 F. Supp. at 541)).

The Court does not agree. Section 1166(a), relevant here, is a criminal law that ensures that "gambling activity that violates state licensing, regulatory, or prohibitory law is punishable even though it may not violate federal law." *United States v. Cook*, 922 F.2d 1026, 1034 (2d Cir. 1991); *see also Stand Up for Cal.! v. U.S. Dep't of Interior*, 959 F.3d 1154, 1160 (9th Cir. 2020) ("Section 1166 subjects to criminal liability anyone who conducts gambling activities on Indian lands who would have been subject to criminal liability by the state if the activities had occurred on state rather than Indian lands."). As the Nation states, Section 1166 "does not subject Indian

---

[4] While the Ninth Circuit affirmed the district court's holding, it did not consider the issue of whether IGRA applied to state-operated gaming. *See Cour D'Alene Tribe v. State of Idaho*, 51 F.3d 876 (9th Cir. 1995).

lands to the broad application of state civil regulatory laws, nor does it authorize the application of state laws governing state-operated gaming, such as lotteries, on Indian reservations." (Dkt. No. 42, at 29). Other than *Yakama Indian Nation*, State Defendants cite to no other case law indicating Section 1166 operates in the way suggested, and the Court sees no reason to adopt its reasoning here.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the State Defendants' motion to dismiss, (Dkt. No. 37), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the Nation's claims against the Commission are **DISMISSED** for lack of subject matter jurisdiction; and it is further

**ORDERED** that the State Defendants' motion to dismiss, (Dkt. No. 37), is otherwise **DENIED**; and it is further

**ORDERED** that if the State Defendants wish to renew their motion to dismiss on the basis that the Nation lacks equity jurisdiction, the renewed motion to dismiss is due by April 18, 2025.

**IT IS SO ORDERED.**

Dated: <u>March 31, 2025</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge