**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CAYUGA NATION, a federally recognized Indian Nation,

                    Plaintiff,                5:24-cv-537 (BKS/TWD)

v.

NEW YORK STATE GAMING COMMISSION, BRIAN
O'DWYER, in his official capacity as the Chair and
Commissioner of the New York State Gaming
Commission, JOHN A. CROTTY, SYLVIA B. HAMER,
MARTIN J. MACK, PETER J. MOSCHETTI, JR.,
MARISSA SHORENSTEIN, and JERRY SKURNIK, in
their official capacities as Commissioners of the New York
State Gaming Commission,

                    Defendants.

---

**Appearances:**

*For Plaintiff:*
David G. Burch, Jr.
Barclay Damon LLP
125 East Jefferson Street
Syracuse, NY 13202

Kyra E. Ganswith
Barclay Damon LLP
80 State Street
Albany, NY 12207

Jennifer J. Hopkins
Barclay Damon LLP
1742 N Street, NW
Washington, D.C. 20036

*For Defendants:*
Letitia James
Attorney General of the State of New York
Aimee Cowan
Assistant Attorney General
300 South State Street, Suite 300
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On April 18, 2024, Plaintiff Cayuga Nation (the "Nation"), a federally recognized Indian Nation, initiated this action for declaratory and injunctive relief against the New York State Gaming Commission; Brian O'Dwyer, in his official capacity as Chair and Commissioner of the NYSGC; John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Peter J. Moschetti, Jr., Marissa Shorenstein, and Jerry Skurnik, in their official capacities as Commissioners of the NYSGC; and JackPocket, Inc. (Dkt. No. 1).[1] The NYSGC and the Commissioners moved to dismiss the Nation's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), (Dkt. No. 37), and the Court heard oral argument on the motion on March 27, 2025. Following oral argument, the Court granted the motion to dismiss in part and denied it in part, dismissing the Nation's claims as against NYSGC but otherwise denying the motion. (Dkt. No. 61). However, the Court granted the Commissioners permission to renew their motion to dismiss on the basis that the Nation lacked equity jurisdiction. (*Id.*). Currently before the Court is the Commissioners' renewed motion to dismiss. (Dkt. No. 63).[2] The motion is fully briefed. (Dkt. Nos. 63-1, 65, 76). For the following reasons, the Court denies the Commissioners' renewed motion to dismiss.

[1] JackPocket, Inc. has subsequently been dismissed from this action. (*See* Dkt. No. 82).

[2] After the renewed motion to dismiss was filed, the Nation filed the Second Amended Complaint ("SAC"), removing all claims and allegations against JackPocket. (*See* Dkt. No. 71, at 2 ("As part of the negotiated resolution between the Nation and Jackpocket, the Nation has agreed to withdraw all claims and allegations in the operative Complaint relating to Jackpocket, including the withdrawal of Counts III and IV.")). The Commissioners consented to the filing of the SAC and requested that the Court consider the renewed motion to dismiss in light of the facts alleged therein. (Dkt. No. 78). Accordingly, all citations to the operative complaint are to the SAC, at Dkt. No. 80. Additionally, while the Court previously dismissed Defendant NYSGC from this case, the SAC continues to name the NYSGC as a Defendant. (*See* Dkt. No. 80). As the SAC contains no new allegations against NYSGC, the reasons for dismissal continue to apply, *see Cayuga Nation v. N.Y. State Gaming Comm'n*, 775 F. Supp. 3d 651, 663 (N.D.N.Y. 2025), and the Clerk of Court is directed to remove NYSGC from the caption.

## II.     BACKGROUND

The Court presumes the parties' familiarity with its March 31, 2025 decision, which recites the statutory and factual background of the case. *Cayuga Nation*, 775 F. Supp. 3d at 655–57.

## III.     STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.     DISCUSSION

In support of their previous motion to dismiss, the State Defendants argued that the Nation could not pursue its claims because it lacked a private right of action under IGRA. (Dkt. No. 37-1, at 18–20). In response, the Nation appeared not to dispute the proposition that it lacked a private right of action in this case but instead argued that its "claims fall squarely within the federal courts' long-established authority to enjoin ongoing violations of federal law." (Dkt. No. 42, at 25; *see generally id.* at 22–25). Finding that "[a]t least one other district court ha[d] declined to dismiss a plaintiff tribe's IGRA preemption claim on the basis that the court lacked

equity jurisdiction," and noting that "the parties ha[d] not meaningfully addressed whether the Court has equitable jurisdiction," the Court explained that it could not determine that the Nation was unable to proceed with its claims at that time. *Cayuga Nation*, 775 F. Supp. 3d at 664–65 (citing *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1316 (D. Ariz. 2015)). However, the Court allowed the Commissioners to renew their motion such that the parties could adequately address the issue. *See id.* at 665–68.

Now, in their renewed motion to dismiss, the Commissioners argue that "the Nation cannot rely on this Court's equity jurisdiction as a substitute for a cause of action." (Dkt. No. 63-1, at 5). In response, the Nation contends for the first time that, while it may also proceed with its claims under the Court's equity jurisdiction, it also has an express or implied right of action under IGRA. (Dkt. No. 65, at 9–16).

The Nation had the opportunity to make these arguments in response to the State Defendants' original motion. The Nation, however, did not contest the State Defendants' argument, made in their first motion to dismiss, that IGRA did not confer a private right of action. (*See generally* Dkt. No. 42). Instead, the Nation argued that it stated a claim for equitable relief, and that the State Defendants' private-right-of-action argument "ignores the nature of relief the Nation seeks and the Court's broad powers to provide redress for ongoing violations of federal law." (*Id.* at 22). The Nation does not explain why, having forgone the opportunity to argue the existence of a private right of action, it may now do so, or why its initial position has changed. Nevertheless, the Court briefly addresses the Nation's arguments on this subject before moving on to discuss the issue of equity jurisdiction.

A.    **Private Right of Action**

The Nation argues that IGRA provides it with either an express or an implied right of action in this case. (Dkt. No. 65, at 9–16). The Commissioners, consistent with their previous

position, disagree that such a private right of action exists, either in express or implied form.

(Dkt. No. 76, at 5-7).

As the Supreme Court explained in *Alexander v. Sandoval*,

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

532 U.S. 275, 286–87 (2001) (citations omitted).

The Nation contends that "[t]he statutory text, structure, and legislative history collectively establish that Congress expressly intended to create enforceable rights for Indian nations—including a cause of action to prevent states or third parties from authorizing unlawful Class III gaming on Indian land without an Indian nation's approval." (Dkt. No. 65, at 9). As part of this argument, the Nation relies on 25 U.S.C. § 2710(d)(7)(A)(ii), which states that "the United States district courts shall have jurisdiction over" "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect." (*See id.* at 11–13). The Nation argues that the "and" in this sentence should instead be understood to mean "or," thus, the statute would authorize federal district courts to have jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands," without the requirement that such gaming activity be "conducted in violation of any Tribal-State compact," which here does not exist. (*See id.)*. The Nation further asserts that such an interpretation is consistent with the Senate report's Section-by-Section analysis of IGRA, which states that Section 2710(d)(7)(A) "[g]rants United States district courts jurisdiction

over action by . . . a tribe or state to enjoin illegal gaming on Indian lands." (*Id.* at 12 (citing S.

Rep. No. 100-446, at 18 (1988))). Moreover, according to the Nation "[a] literal reading of 'and'

would undermine IGRA's protections by allowing state or third parties to authorize gaming on

Indian lands without an Indian nation's consent, while simultaneously denying nations the ability

to seek judicial relief simply because no compact exists," "a result [that] would invert the

statute's structure and frustrate the fundamental goals Congress sought to achieve." (*Id.* (citation

omitted)).

>      As stated in this Court's previous decision:

>> "Every exercise in statutory construction must begin with the words
>> of the text." *New York Legal Assistance Grp. v. Bd. of Immigr.
>> Appeals*, 987 F.3d 207, 216 (2d Cir. 2021) (quoting *Saks v. Franklin
>> Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)). "The words of the
>> text to be interpreted are not considered alone, however. Instead, we
>> 'look[ ] to the statutory scheme as a whole and plac[e] the particular
>> provision within the context of that statute.'" *Id.* (quoting *Saks*, 316
>> F.3d at 345). "If the text of the statute 'is not entirely clear, we then
>> turn to the broader statutory context and its history.'" *Id.* (quoting
>> *Khalid v. Sessions*, 904 F.3d 129, 132 (2d Cir. 2018)); *accord
>> Cayuga Nation v. Tanner*, 6 F.4th 361, 378 (2d Cir. 2021) ("In
>> interpreting a statute, we look first to the language of the statute
>> itself. When the language of the statute is unambiguous, judicial
>> inquiry is complete." (quoting *Marvel Characters, Inc. v. Simon*,
>> 310 F.3d 280, 289–90 (2d Cir. 2002))).

*Cayuga Nation*, 775 F. Supp. 3d at 665.

>      Applying this standard to the provision at issue, the Court notes that there is no ambiguity

in the text that would lead the Court to consider the word "and" to have anything other than its

standard meaning. As there is no ambiguity, the Court need go no further. *See Michigan v. Bay

Mills Indian Cmty.*, Nos. 10-cv-1273, 10-cv-1278, 2011 WL 13186010, at *6, 2011 U.S. Dist.

LEXIS 164287, at *18–19 (W.D. Mich. Mar. 29, 2011), *vacated on other grounds* 695 F. 3d 406

(6th Cir. 2012) (explaining that the "usefulness" of certain opinions holding that "and" means

"or" or "or" means "and" "is limited to situations where the statute is ambiguous" and finding that because the language under consideration "[was] unambiguous, there [was] no need to either depart from the ordinary rules of construction or resort to the provision's legislative history").

Second, the Nation contends that "[e]ven if the Court concludes that IGRA's text and legislative history do not expressly create a cause of action for the Nation to enforce the statute, a private right of action is nevertheless implied." (Dkt. No. 65, at 13). The Court disagrees. The Nation has not pointed to any indication in the text, structure of IGRA, or legislative history indicating that Congress intended to provide tribes with a private right of action to protect against the conduct *specifically* alleged here, i.e. class III gaming conducted by a state on Indian lands in the absence of a tribal-state compact. (*See generally id.* at 14–16). Moreover, the fact that Congress did provide private rights of action for some causes of action indicates that it did not imply the creation of others. As the Ninth Circuit explained in *Hein v. Capitan Grande Band of Diegueno Mission Indians*,

> Where IGRA creates a private cause of action, it does so explicitly. For example, it specifically provides for suit by an Indian tribe to compel action by the Commission to approve or disapprove management contracts, 25 U.S.C. § 2711(d), and also explicitly allows for tribes to sue states under some circumstances. 25 U.S.C. § 2710(d). . . . Where a statute creates a comprehensive regulatory scheme and provides for particular remedies, courts should not expand the coverage of the statute.

201 F.3d 1256, 1260 (9th Cir. 2000) (citation omitted). Multiple other circuit courts that have considered whether IGRA implies a private cause of action outside of those expressly provided have reached the same conclusion on similar grounds. *See Tamiami Partners, Ltd. By & Through Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1049 (11th Cir. 1995); *Hartman v. Kickapoo Tribe Gaming Comm'n*, 319 F.3d 1230, 1232–33 (10th Cir. 2003);

*Alabama v. PCI Gaming Authority*, 801 F.3d 1278, 1299–1300 (11th Cir. 2015). The Nation has not pointed to any case taking the opposite approach.

Accordingly, the Court finds that the Nation does not have either an express or implied private right of action to proceed with its claims under IGRA.

### B.    Equity Jurisdiction

Consistent with its arguments in response to the State Defendants' first motion to dismiss, the Nation also argues that "equitable jurisdiction provides an independent basis for relief." (Dkt. No. 65, at 16). The Commissioners make three arguments in opposition: first, that equity jurisdiction is not a substitute for a private right of action; second, that the relevant factors weigh against the Nation's position that it can receive equitable relief; and alternatively, that equitable relief is not available because the Nation does not have a preemption claim. (Dkt. No. 63-1, at 6–14).

In *Armstrong v. Exceptional Child Ctr., Inc.*, the Supreme Court considered whether care providers could bring an action that Idaho violated the Medicaid Act by "reimbursing providers of habilitation services at rates lower than [Section] 30(A) [of the Medicaid Act] permits." 575 U.S. 320, 324 (2015). The Ninth Circuit had found that "the providers had an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation." *Id.* (citation and internal quotation marks omitted)). Reversing the Ninth Circuit's decision, the Court held "that the Supremacy Clause does not confer a right of action." *Id.* at 326. However, at the same time, the Court affirmed the right of courts "to enjoin unlawful executive action," explaining that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*

at 327 (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)).

The Second Circuit has recognized "federal equity jurisdiction to enjoin enforcement of preempted state laws." *UnitedHealthcare of New York, Inc. v. Lacewell*, 967 F.3d 82, 90-91 (2d Cir. 2020) ("When a private plaintiff claims that a federal law protects it from state regulation, 'the court may issue an injunction upon finding the state regulatory actions preempted.'" (citing *Armstrong*, 575 U.S. at 326)); *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 144–47, 155 (2d Cir. 2016) (holding that plaintiffs' action to enjoin enforcement of local laws enacted in violation of the Airport Noise and Capacity Act of 1990 ("ANCA") "falls squarely within federal equity jurisdiction as recognized in *Ex parte Young*[3] and its progeny").

The Commissioners are of course correct that a court may not make use of its equitable jurisdiction to allow "a plaintiff [to] obtain relief from a federal court any time that it alleges that a defendant violated a federal statute." (Dkt. No. 63-1, at 6). But following *Armstrong*, courts have considered whether a suit may proceed in equity jurisdiction where a plaintiff seeks to enjoin state action on the basis that such state action is preempted by federal law, even when the underlying federal statute would not provide the plaintiff with a private right of action to proceed. *See, e.g.*, *Friends of the East Hampton Airport, Inc.*, 841 F.3d at 145–47, 155 (acknowledging that the district court found that ANCA contained no private right of action, and determining that "[t]he district court properly exercised federal equity jurisdiction to hear plaintiffs' claim that enforcement of the challenged Local Laws is barred by preemptive federal aviation law"); *Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, 272 F. Supp. 3d 554, 563–

_____
[3] 209 U.S. 123 (1908).

67 (S.D.N.Y. 2017) (explaining that because the plaintiffs did not argue that the Federal Power

Act gave them a private right of action, the only way to pursue their preemption claims would be

through equity jurisdiction and considering if equity jurisdiction existed), *aff'd on other grounds*

906 F.3d 41 (2d Cir. 2018); *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 11

(D.D.C. 2024) ("And though [the Rehabilitation Act] does not provide the [plaintiffs] with a

private right of action, they may sue in equity under *Armstrong*."). Accordingly, to the extent the

Commissioners argue that because the Nation has no private right of action under IGRA, the

Nation cannot proceed in equity, (*see* Dkt. No. 63-1, at 6–9), they are incorrect.

This does not mean that there are no limits to a court's equitable jurisdiction. The

Supreme Court in *Armstrong* clarified that "[t]he power of federal courts of equity to enjoin

unlawful executive action is subject to express and implied statutory limitations. Courts of equity

can no more disregard statutory and constitutional requirements and provisions than can courts

of law." 575 U.S. at 327–28 (citations and internal quotation marks omitted). And in that case,

the Court found that "[t]wo aspects of [Section] 30(A) establish[ed] Congress's 'intent to

foreclose' equitable relief." *Id.* at 328 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,

535 U.S. 635, 647 (2002)). The first was that "the sole remedy Congress provided for a State's

failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the

Secretary of Health and Human Services," *id.* (citing 42 U.S.C. § 1396c), explaining that "the

'express provision of one method of enforcing a substantive rule suggests that Congress intended

to preclude others,'" (*id.* (quoting *Sandoval*, 532 U.S. at 290)).

The Court further stated that "[t]he provision for the Secretary's enforcement by

withholding funds might not, by itself, preclude the availability of equitable relief," "[b]ut it does

so when combined with the judicially unadministrable nature of [Section] 30(A)'s text." *Id.*

(internal citation omitted). In explaining this second aspect, the Court referred to Section 30(A)'s broad and nonspecific "mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" *Id.* The Court continued, "[e]xplicitly conferring enforcement of [Section 30(A)'s] judgment-laden standard upon the Secretary alone establishes, we think, that Congress 'wanted to make the agency remedy that it provided exclusive,' thereby achieving 'the expertise, uniformity, widespread consultation and resulting administrative guidance that can accompany agency decisionmaking,' and avoiding 'the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action.'" *Id.* at 328–29 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 292 (2002) (Breyer, J., concurring in judgment)).

Therefore, the Court will consider whether Congress intended IGRA to foreclose equitable relief with respect to the provision governing Class III gaming activities, 25 U.S.C. § 2710(d)(1). The Court examines each "aspect" that the Supreme Court in *Armstrong* found "establish[ed] Congress's intent to foreclose equitable relief," 575 U.S. at 328 (citation omitted): the presence of a sole statutory remedy and the judicial administrability of the provision.

### 1.    Sole Remedy

On the first factor, the Commissioners contend that Congress intended the National Indian Gaming Commission to be the entity to enforce violations of IGRA. (Dkt. No. 63-1, at 11). The Nation responds that, like ANCA, the statute at issue in *Friends of the East Hampton Airport*, "IGRA demands participation by multiple sovereign entities and compliance with procedural steps. Critically, it does not channel all disputes into a single agency or create a sole, exclusive administrative remedy." (Dkt. No. 65, at 20–21).

The Court agrees that IGRA does not provide a sole remedy for violations of its provisions. First, while, as stated, IGRA does not provide a private right of action for the claim at issue here, IGRA clearly contemplates enforcement of its provisions through the courts as well as through the NIGC. *See* 25 U.S.C. § 2710(d)(7)(A) (providing federal district courts jurisdiction over certain claims regarding failure to comply with IGRA's requirements); 25 U.S.C. § 2704 (establishing NIGC). The NIGC itself is permitted multiple ways of enforcing IGRA, including having the "authority to levy and collect appropriate civil fines . . . against the tribal operator of an Indian game or a management contractor engaged in gaming," as well as the "power to order temporary closure of an Indian game." 25 U.S.C. § 2713(a), (b).[4] These "numerous remedies" differentiate this case from *Armstrong. Virgin Mobile USA, L.P. v. Pat Apple*, No. 17-cv-2524, 2018 WL 2926576, at *4, 2018 U.S. Dist. LEXIS 95839, at *10–11 (D. Kan. June 7, 2018) (explaining that, unlike the Medicaid Act at issue in *Armstrong*, the Federal Communications Act of 1934's enforcement provision provided multiple means of enforcement); *CNSP, Inc. v. Webber*, No. 17-cv-355, 2020 WL 2745456, at *6, 2020 U.S. Dist. LEXIS 92257, at *17 (D.N.M. May 27, 2020) (finding the same with respect to the Telecommunications Act of 1996's enforcement provision); *see also Tohono*, 130 F. Supp. 3d at 1316 ("IGRA provides no comparable remedy [to the remedy in *Armstrong*] for allegedly preempted state efforts to regulate Indian gaming.") .

---

[4] The Court notes that neither of these civil penalties would appear to cover the conduct the Nation complains of here, as the Commissioners are not a "tribal operator of an Indian game," or "a management contractor engaged in gaming," as required to be subject to a civil penalty under Section 2713(a), and are not operating "an Indian game" that could be closed under Section 2713(b). While the Commissioners also raise potential ways violations of IGRA could be enforced through NIGC-created regulations, (*see* Dkt. No. 63-1, at 11; Dkt. No. 76, at 9–10), the Court does not find that Congress' grant of power to NIGC to create regulations reflects any intent to preclude equitable relief.

2.      **Judicial Administrability**

The Commissioners argue that "[w]ith respect to the second *Armstrong* factor, this case aptly illustrates how questions concerning the existence of obligations or prohibitions under the IGRA, and the available remedies for breaches of those obligations or prohibitions, can produce numerous combinations of answers" and that "[i]nstead of creating the legitimate possibility that district courts across the country could reach potentially conflicting conclusions on claims arising under the IGRA, Congress intended for the NIGC—with its nationwide reach and perspective—to chart the path forward with consistent conclusions and guidance." (Dkt. No. 63-1, at 11–12). In response, the Nation states that "[d]etermining whether a state is conducting or authorizing Class III gaming without Indian nation consent involves straightforward statutory interpretation, not complex policy judgments or economic rate-setting like the Medicaid statute at issue in *Armstrong*." (Dkt. No. 65, at 21 (citation omitted)).

Section 2710(d)(1) imposes three requirements on Class III gaming activities in order for them to be lawful on Indian lands. Such activities must be (1) "authorized by an ordinance or resolution that . . . (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands, (ii) meets the requirements of subsection (b), and (iii) is approved by the chairman"; (2) "located in a State that permits such gaming for any purpose by any person, organization, or entity"; and (3) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and State under paragraph (3) that is in effect." 25 U.S.C. § 2710(d)(1)(A)–(C). As in *Friends of the East Hampton Airport*, in which the relevant provision of ANCA set up a "simple rule" whereby "airports seeking to impose noise restrictions on Stage 3 aircraft must obtain either the consent of all aircraft operators or FAA approval," here too it is "'difficult to imagine' more straightforward requirements." 841 F.3d at 146 (quoting *Armstrong*, 575 U.S. at 328). "A federal court can evaluate [a gaming operator's] compliance with these

13

obligations without engaging in the sort of 'judgment-laden' review that the Supreme Court in *Armstrong* concluded evinced Congress's intent not to permit private enforcement of [Section] 30A of the Medicaid Act." *Id.* at 147; *see also UnitedHealthcare of N.Y., Inc. v. Lacewell*, 967 F.3d 82, 90 (2d Cir. 2020) (finding that neither the Affordable Care Act's statutory or regulatory provisions at issue in the case were "judicially unadministrable" because "[t]he District Court had only to determine whether the provisions preclude a State from unilaterally establishing a risk adjustment program or methodology and, if so, whether the state program or methodology was nevertheless authorized by HHS" (internal citation omitted)).

The Court therefore finds that that the relevant provision of IGRA, Section 2710(d)(1), is judicially administrable, and thus neither of the *Armstrong* factors supports an understanding that Congress intended to foreclose equitable relief in this instance.

### 3.    Preemption

The Commissioners also argue that the exercise of equity jurisdiction is not appropriate here because there is no claim of preemption. (Dkt. No. 63-1, at 12–14). The Nation disputes this assertion, instead arguing that "the Nation's claims [] lie well within the scope of preemption-based actions for which equitable relief is available." (Dkt. No. 65, at 27; *see generally id.* at 25–27).

The Commissioners' argument rests on two points. First, the Commissioners insist that the Court "recognized" that "there is no preemption claim in this case." (Dkt. No. 63-1, at 13; *see also* Dkt. No. 76, at 12). This argument is misplaced. This Court's previous decision stated that that the Court did not understand the Nation as asserting that it could "rely on federal preemption *as the source of an enforceable substantive right*." *Cayuga Nation*, 775 F. Supp. 3d at 664 (emphasis added) (quoting Dkt. No. 47, at 11). This is not the same as finding that there is no preemption argument available to the Nation.

14

Second, the Commissioners argue that there cannot be a preemption claim in this case, "given that the amended complaint fails to identify any state or local law that purportedly conflicts with the IGRA." (Dkt. No. 63-1, at 13; *see also* Dkt. No. 76 ("The Nation is not exposed to 'regulation' at all. It does not allege that it is engaging in any action or inaction that would imminently expose it to an assertion of the State defendants' regulatory authority to which the IGRA may be a defense.")). In response, the Nation argues that "[a]lthough [its] Complaint does not identify a particular New York statute, it repeatedly alleges that IGRA preempts any attempt by the State to authorize or regulate Class III gaming on Indian lands absent a valid compact." (Dkt. No. 65, at 25–26; *see also* Dkt. No. 80, at ¶¶ 3 ("Federal law preempts New York State's attempts to game on the Nation's reservation."), 39 ("IGRA preempts any state regulation or control of gaming on Indian lands."), 40 ("IGRA wholly preempts New York law related to gaming on Indian lands except where a tribe and the State enter into a compact.")). Additionally, the Nation explains that "[c]ourts evaluating preemption claims do not require that a particular state law be identified by number; rather, the focus is on whether the alleged state action or conduct conflicts with federal law." (Dkt. No. 65, at 25 n.3).

The Commissioners have not cited any case law to suggest that the Nation must point to a specific law or regulation in order for its preemption claims to survive a motion to dismiss. And in *Williams v. Marinelli*, the Second Circuit explained that "[a]lthough preemption often applies to state statutes, preemption can also invalidate actions of state executive branch officials and state courts that conflict with federal law." 987 F.3d 188, 198 (2d Cir. 2021) (upholding the district court's decision that certain of Connecticut's "actions," here, the "voluntary indemnification of [a former Connecticut corrections officer] and its attempt to recoup more than half of [a prevailing plaintiff's] judgment" were preempted by 42 U.S.C. § 1983).

Even so, the Nation has pointed to specific examples of the State's regulatory authority impacting the Nation. Here, the SAC alleges that the NYSGC "administers all aspects in regards to the State lottery, including the use of vending machines, safekeeping operations and control, and distribution of lottery tickets." (Dkt. No. 80, ¶ 43 (citing 9 N.Y.C.R.R. § 5000.1)). New York State allegedly operates two types of Class III gaming within the Nation's Reservation: lottery vending machines with an "instant lottery game," or "scratch-off game" established under 9 N.Y.C.R.R. §§ 5006.1 and 5006.2, and lottery terminals with "various 'draw games' such as New York Lotto, New York PowerBall, [and] New York Mega Millions." (*Id.* ¶¶ 45–46, 49). [5]

The Court therefore finds that at this time the Commissioners have failed to establish, as a matter of law, that this Court lacks federal equity jurisdiction to proceed.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Commissioners' renewed motion to dismiss, (Dkt. No. 63), is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>July 30, 2025</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[5] In its reply brief the Commissioners argue that state-operated gaming on Indian lands does not expose the Nation to any "regulatory authority to which IGRA may be a defense," and that the Nation is thus attempting to use IGRA and *Ex Parte Young* "as a sword" (as opposed to a shield). (*See* Dkt. No. 76, at 12–14). But while the Nation may not be threatened with fines or other sanctions, the New York State Gaming Commission allegedly regulates gaming that is occurring on the Nation's Reservation, and the Nation is fundamentally asking for "state officials to leave it alone." *Virgin Mobile USA, L.P.*, 2018 WL 2926576, at *4, 2018 U.S. Dist. LEXIS 95839, at *10 (noting that a plaintiff who wanted "state officials to leave it alone" was "using *Ex parte Young* as a shield, rather than a sword," and also noting that in *Armstrong* plaintiffs "were attempting to force state officials to pay them higher rates for habilitation services," essentially attempting "to use *Ex parte Young* as a sword").